J-A13024-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: Z.M.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: Z.M.W., A MINOR | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1732 WDA 2017 |

Appeal from the Order October 17, 2017
In the Court of Common Pleas of Lawrence County Civil Division at
No(s):  No. 91 of 2014 DP

BEFORE:  OLSON, J., DUBOW, J., and MUSMANNO, J.

MEMORANDUM BY DUBOW, J.:                    **FILED JULY 17, 2018**

Z.M.W. (born in April 2006), through his counsel, appeals from the Order denying the Petition filed by the Lawrence County Children and Youth Services ("Agency") seeking a dependency goal change from subsidized permanent legal custody ("SPLC") to adoption.   After careful review, we affirm.

In January 2014, Z.M.W.'s mother ("Mother") suffered a massive stroke. Because of resulting physical and mental disabilities, Mother moved to a transitional group home.[1] Z.M.W. and his older sister, both of whom had lived primarily with Mother, moved in with their father.  In October 2014, after Father suffered a mental health crisis, the Agency filed a Petition for

_____

[1] Mother also has a long history of mental health issues. **See** Order, dated June 16, 2017, at 3.

Emergency Protective Custody. The court granted the motion and the Agency placed Z.M.W. in a foster home.[2]

After a hearing, the court adjudicated Z.M.W. dependent, and granted custody to the Agency with a goal of reunification. A Family Service Plan ("FSP") became effective in November 2015. In April 2015, after a permanency review hearing, the placement goal remained reunification with a concurrent goal of adoption.

Permanency review hearings occurred at regular intervals, each indicating Mother's inability to parent Child due to her disabilities. On October 18, 2016, the court signed a permanency review order noting Mother's "very serious physical and cognitive health issues as a result of a stroke," and concluding that, although Mother was "complying with the permanency plan to the best of her ability considering her circumstances, [ ] there is no indication that she will be able to fully parent the child." Order, dated Oct. 18, 2016, at 1. The court ordered that the Agency "explore permanency plans that assure that Mother will always maintain contact with the child," and directed the Agency to consider both permanent legal custody and adoption as dependency goals. *See id*. at 7.

On November 30, 2016, the Agency filed a Motion seeking to change the permanency goal from reunification to adoption and a Petition to

_____

[2] Z.M.W.'s sister was placed in kinship care. She is now 18 years old.

Terminate Parental Rights. The court held a hearing over two days in March, and reopened the case for further proceedings in June 2017.

On June 16, 2017, the court entered an Order changing the goal from reunification to subsidized permanent legal custodianship ("SPLC") and denying the Agency's Petition to Terminate Mother's parental rights.[3] After recognizing that Mother was not able to care for the Child in her home, the court concluded: "Mother clearly loves her son and the son loves his Mother and both want to maintain a relationship with each other." Order dated June 16, 2017, at 4. The court concluded that "[i]t is not in the best interest of the [C]hild to sever the relationship between [him] and his Mother. Despite her limitations and disability, there is love between the Mother and son and the potential loss of that relationship would be detrimental to the [C]hild." *Id*. The court concluded that the [C]hild's desire for permanency "can be accomplished without terminating the Mother's parental rights." *Id*.

Neither the Agency nor Z.M.W. appealed the goal change to SPLC or the denial of the parental rights termination petition.

On August 3, 2017, the Agency filed a Motion for a Goal Change, based on, *inter alia*, the Child's wish to be adopted by his foster parents and asserted that "the minor's relationship with Natural Mother is deteriorated to the point where he will hide in the bathroom during visits arranged at the Cray Visitation House." Motion, filed Aug. 3, 2017, at 3. The Agency also asserted that "the

---

[3] The court granted the Petition terminating Father's parental rights.

minor has the right to have natural Mother's rights terminated so he may be adopted." ***Id***.

The court scheduled a hearing on the request for August 18, 2017, directing that Z.M.W. attend the hearing "to be interviewed regarding his behavior changes." Order, dated Aug. 3, 2017. On the afternoon of August 18, 2017, the court held the hearing with Z.M.W. in attendance.[4] In addition to Z.M.W.'s testimony, the court heard testimony from the Child's sister, his Mother, his foster Mother, Kayla Gould (the Agency caseworker), Stacy Durkin (his cognitive behavioral therapist), and Jill Kaufman (the supervisor of the Visitation Home).

The court interviewed Z.M.W., who stated that he hides in the bathroom during visits "because I really don't want to talk to [Mother] because she doesn't talk to me most of the time, and sometimes it's 'cause I need to go poop for a long time." N.T., 8/18/17, at 12. He also stated that he locked himself in the bathroom to make Mother talk to him. ***Id***. at 16. Z.M.W. also stated, in response to the court's question, that if he (Z.M.W.) were "king," he "would like to let her be my, like, mom still." ***Id***. at 20. Later, Z.M.W. said he wanted to be adopted because he "started to love [his foster parents] so much," and he was happy staying with them. ***Id***., at 27, 36. He also stated that he did not want his visits with his mom to stop, and that he wanted

---

[4] On the morning of August 18, 2017, Z.M.W. was not in attendance. The Court found the Agency's attorney in contempt for deciding not to bring the child to the hearing as directed by the August 3rd Order, and imposed a fine.

- 4 -

the visits to be at least 15 minutes longer and at places outside of the visitation house. *See*, *id*. at 26, 27, 32-34.

S.P., the Child's foster mother, testified that she is supportive of him maintaining contact with Mother. *Id*. at 63. She also stated that she did not want SPLC because she believes the best option for Z.M.W. is the permanent security of adoption. *Id*. at 64. She also testified that Z.M.W. had some temporary regressive behavior issues after the court entered the SPLC Order, which she attributed to the news that he would not be adopted. *See id*. at 65-67. S.P. also told the court that, if Mother's rights were not terminated and she and her husband remained foster parents, Z.M.W. "will always have a place in my home and my heart." *Id*. at 73.

Kayla Gould, the Agency caseworker, testified regarding the visits she has observed between Mother and Z.M.W., noting two times where Mother acted inappropriately. Z.M.W.'s attorney questioned Ms. Gould regarding Mother's physical and mental disabilities that she has observed. The court questioned Ms. Gould about the Agency's willingness to accommodate Z.M.W.'s request for longer visits with Mother, and Ms. Gould stated that as long as visits occur Monday through Friday between 8 and 4, they would be able to transport Z.M.W. to restaurants and movies with his Mother. *Id*. at 91.

Stacey Durkin, the Child's cognitive behavioral therapist, testified that she has been treating Z.M.W weekly since February 2017 for post-traumatic stress disorder ("PTSD") resulting from neglect in his father's home and his

removal from his home. *Id*. at 48-9.[5] Ms. Durkin stated, among other things, that Z.M.W. told her he wanted to be adopted by his foster parents, and that after the court changed the goal to SPLC instead of adoption, he was sad for a couple of sessions. She also testified that Z.M.W. told her that he was worried that he would have to go back and live with Mother. *See* N.T., Oct. 13, 2017, at 12, 43. She also stated that she was not surprised to hear that Z.M.W. wanted to spend more time with Mother because he "has always maintained that he has positive feelings towards his mother," and "he's never said anything that . . . would make me believe that he didn't want a relationship with her." *Id*. at 33. Ms. Durkin testified that she has seen no evidence of deterioration in Z.M.W.'s relationship with his mother and that, in her opinion, Z.M.W. "fully expects to have a continued relationship with his mother." *Id*. at 44. She stated that she could not speak to whether severing the relationship with his mother would traumatize Z.M.W. but opined that because "he's never said anything negative about this relationship with his mother currently, it could possibly cause damage to --- I mean, it would make sense that it would cause damage to, you know, not allow him to see her anymore, of course." *Id*. at 45.

Jill Kaufman, from the Visitation House, testified that she and her staff have frequently had to tell Mother during the one-hour visits to engage in some activity with Z.M.W. She stated that she has observed visits between

---

[5] The Agency had asked S.P. and R.P. to obtain psychological treatment for Z.M.W. due to his acting out behaviors at school and at home.

Mother and Z.M.W. on camera (with no audio), at which she saw little physical interaction between them, and noted one instance where Mother would not play scrabble with Z.M.W. *See* N.T., 9/18/17, at 12, 29. She also stated that at the beginning, Mother used to have conversations about school and extracurricular activities but "those conversations are extremely limited now, very few." N.T. at 20.

On October 16, 2017, the court denied the Agency's Motion to change the placement goal to adoption and ordered the Agency to arrange for visits outside the visitation house, in a more normal, non-structured, non-supervised, setting, for a minimum of two hours each visit at least once a week. *See* Order, dated Oct. 16, 2017, at 2.

Z.M.W., through counsel, filed a Notice of Appeal and a concise statement of errors complained of on appeal on November 16, 2017.[6] The juvenile court subsequently filed an Opinion pursuant to Pa.R.A.P. 1925(a).

_____

[6] On November 17, 2017, the day after the appeal was filed, the juvenile court clarified the visitation part of its October 16, 2017, Order on motion by the Agency, and ordered the Agency to transport Z.M.W. after school each Tuesday from the school to Mother's home where he will visit for two hours, beginning when he arrives there. The court further ordered the Agency to transport the Child to the foster parents' home at the conclusion of the visit. The Agency appealed that Order, averring the court had no jurisdiction to enter it and that it was an abuse of discretion to order county employees to perform duties outside of normal work hours without the consent of, and over objection by, the County. That Appeal is docketed in this Court at 1832 WDA 2018/J-A13025-18. On July 16, 2018, this Court affirmed the transportation rder.

Z.M.W. raises the following questions for our review, reordered:

1. Whether the lower court violated the constitutional rights of the minor child when it denied the Agency's Motion for a change of goal and ordered an increase in the natural Mother's visitation?

2. Whether the lower court erred and committed an abuse of discretion when it denied the Agency's Motion for a Change of Goal and ordered an increase in the natural Mother's visitation, in contradiction of the testimony of professionals and contrary to the best interests of the minor child?

Appellant's Brief at 6 (unnecessary capitalization omitted).[7]

As a preliminary matter, issues not raised in a Rule 1925(b) concise statement of errors will be deemed waived. **Commonwealth v. Castillo**, 888 A.2d 775, 780 (Pa. 2005) (quoting **Commonwealth v. Lord**, 420, 719 A.2d 306, 309 (Pa. 1998)). "[A] [c]oncise [s]tatement which is too vague to allow the court to identify the issues raised on appeal is the functional equivalent of no [c]oncise [s]tatement at all." **Commonwealth v. Reeves**, 907 A.2d 1, 2 (Pa.Super.2006). Thus, if a concise statement is too vague, the court may find waiver and disregard any argument. **Id. See**, **e.g.**, **Commonwealth v. Lemon**, 804 A.2d 34, 37 (Pa. Super. 2002) (concluding that Rule 1925(b) Statement that "the verdict of the jury was against the evidence," "the verdict of the jury was against the weight of the evidence," and "the verdict was against the law" were too vague to permit adequate review); **Commonwealth v. Seibert**, 799 A.2d 54, 62 (Pa. Super. 2002)

---

[7] Z.M.W.'s guardian *ad litem* joined the Brief filed by Z.M.W.'s counsel.

(concluding that Rule 1925(b) Statement that "the verdict of the jury was against the weight of the credible evidence as to all of the charges" was too vague to permit appellate review); **Commonwealth v. Thompson**, 778 A.2d 1215, 1223-24 (Pa. Super. 2001) (finding the Rule 1925(b) statement that the appellant's sentence for criminal trespass was unconstitutional because it was excessive compared to sentence for simple trespass, was too vague for the trial court to identify).

Here, Z.M.W. asserted in the second issue of his Pa.R.A.P. 1925(b) Statement of Matters Complained of on Appeal that, in denying the Agency's Motion for a Goal Change, the "lower court violated the Minor Child's rights, pursuant to the United States and Pennsylvania Constitutions."  As the trial court observed, this claim "lacks any specificity" from which it could "identify the issue or issues that are being raised by the Appellant," "fails to identify any provision of the United States or Pennsylvania Constitutions that was allegedly violated by the [c]ourt's decision," and "should be deemed waived." TCO, dated Dec. 15, 2017, at 4-5.

We agree.  Accordingly, we conclude Z.M.W.'s first issue is waived.

**Standard and Scope of Review**

We review an order regarding a placement goal of a dependent child under an abuse of discretion standard.  **In re B.S.**, 861 A.2d 974, 976 (Pa. Super. 2004).  "In order to conclude that the trial court abused its discretion, we must determine that the court's judgment was 'manifestly unreasonable,'

*i.e.*, that the court did not apply the law, or that the court's action was a result of partiality, prejudice, bias or ill will, as shown by the record." ***In re N.C.*** 909 A.2d 818, 823 (Pa. Super. 2006) (quoting ***In re G.P.-R.***, 851 A.2d 967, 973 (Pa. Super. 2004).

Appellate courts are bound by the facts as found by the trial court if they are supported by the record. ***In re K.J.***, 27 A.3d 236, 241 (Pa. Super. 2011). In addition, it is the responsibility of the trial court to evaluate the credibility of the witnesses and resolve any conflicts in the testimony. ***In re N.C.***, ***supra*** at 823. Accordingly, "the trial court is free to believe all, part, or none of the evidence." ***Id***. (citation omitted). Provided the trial court's findings are supported by competent evidence, this Court will affirm, "even if the record could also support an opposite result." ***In re Adoption of R.J.S.***, 901 A.2d 502, 506 (Pa. Super. 2006) (citation omitted).

**Dependency - Generally**

The law of the Commonwealth of Pennsylvania empowers a Juvenile Court to make an award of Permanent Legal Custody as a permanency option for a dependent child. 42 Pa.C.S. § 6351(a)(2.1). ***See*** OCY Bulletin 3130–10–02; 314010–03, at 4 (July 30, 2010) (defining permanent legal custody as a permanency plan for a child). The Bulletin recognizes that permanent legal custody is not permanent, and may be terminated upon an order of the court. ***Id.,*** at 26. ***See also*** Pennsylvania Children's Roundtable Initiative, *Pennsylvania Dependency Benchbook,* Harrisburg, PA: Office of Children and

Families in the Courts, 2010, at 86 (explaining that PLC may be terminated with judicial approval, following the filing of a petition by the agency or by the biological parent or legal guardian). "When deemed appropriate, the trial court has the power to permit continued visitation by the [dependent] child's natural parents." ***In re B.S.***, 861 A.2d 974, 977 (Pa. Super. 2004).[8] ***See also*** 42 Pa.C.S. § 6351(a)(2.1).

As with all matters involving children, dependency determinations are focused on the child's best interests. ***G.P.-R***, ***supra*** at 973. Accordingly, when considering an agency's request to change a dependency goal from PLC to adoption, the agency must prove that the goal change is best suited to the child's safety, protection, and physical, mental, and emotional welfare. ***See In re C.B.***, 861 A.2d 287, 295 (Pa. Super. 2004) (noting that the child's safety, permanency, and well-being supersede all other considerations in dependency proceedings).

At each dependency review hearing, the trial court must consider, *inter alia*, the continuing necessity for and appropriateness of the Child's placement, and the appropriateness and feasibility of the current placement goal for the child. 42 Pa.C.S. § 6351(f)(1), (4). Accordingly, when considering a change from PLC to adoption, the court may continue PLC placement "where . . . being

---

[8] We would expect that a court reviewing a motion to terminate PLC and award custody to a parent would ensure that the issues that led to the trial court's adjudication of dependency no longer exist and that the parent, at a minimum, can provide stability, security, and safety for the child.

placed for adoption is not best suited to the safety, protection and physical, mental and moral welfare of the child." 42 Pa.C.S. § 6351(f.1)(3).

**Goal Change**

Z.M.W. asserts that the trial court abused its discretion in denying the Agency's Motion for a Goal Change from SPLC to adoption because its decision was "in contradiction of the testimony of professionals and contrary to the best interests of the minor child." Z.M.W.'s Brief at 6.[9] Based on our review of the record, including the notes of testimony from the hearing, we disagree.

The trial court aptly addressed this and summarized the relevant testimony as follows:

> The child stated that he loved his Mother, that he expected to always be able to visit with his Mother, and that he wanted to continue to see his Mother. He stated that he had never had an opportunity to visit with his Mother outside of the Visitation House or the [Agency] facility and that it was sometimes difficult to enjoy the visits in that setting. He expressed enthusiasm at the thought of having an opportunity to visit with his Mother in a different more normal setting like in a park or at a movie theater or at a restaurant. While he did state that there were times when he went to the bathroom during the visit and locked the door and did not come out until his Mother asked him to come out (as a way of getting her attention), he clearly stated that he did not want his visits with his Mother to stop. He even stated that he wanted the visits to be longer because the one hour was just too short and rushed.

---

[9] Z.M.W. also avers that the court's June 16, 2017 Order changing the goal to PLC rather than the requested adoption was improper. **See** Z.M.W.'s Brief at 11-12. The time for raising that argument would have been on appeal from the June 16, 2017 Order. Since no appeal was filed from that Order, any arguments challenging the trial court's initial goal change to PLC are waived.

> The child's therapist, Susan Durkin, was called by [the Agency] as a witness and contradicted the allegation of the [Agency] that the relationship between the Mother and child had deteriorated. Susan Durkin testified that she had been seeing the child on a weekly basis for eight months and did not note any deterioration in the relationship between the child and his Mother.[10] She stated that there was no indication of any negative behavioral changes following visits with his Mother and that Z.M.W. expects to have a continuing relationship with his Mother. She further testified that it was her understanding that the child has never said anything negative about his relationship with his Mother and that the relationship between the Mother and son should continue and should be fostered. This is precisely why the Court entered an Order on October 13, 2016[,] that the visits take place in a more normal, non-structured setting. Termination of the Mother's parental rights through adoption is not in this child's best interest.

Trial Ct. Op., dated Dec. 15, 2017, at 4.

Our review of the transcript indicates that the court's determination is supported by competent evidence. Although Z.M.W.'s therapist stated that Z.M.W. was sad after the goal change to SPLC rather than adoption, her testimony overwhelmingly indicates that Z.M.W. benefits from his relationship with his Mother as well as with his foster parents. Moreover, in addition to Z.M.W.'s therapist's testimony, the Agency's caseworker testified that she would support Z.M.W.'s continuing relationship with Mother. Thus, contrary to Z.M.W.'s contention, the juvenile court's decision to continue the placement as SPLC instead of adoption is not "in contradiction of the testimony of the professionals."

---

[10] Ms. Durkin also testified that she had not seen Mother and Z.M.W. together.

Moreover, the record supports the court's determination that maintaining the status *quo*, with the addition of more liberal visitation between Mother and Z.M.W., is in the Child's best interests. Z.M.W. himself testified as to the love he feels for his Mother and how he wants to have more meaningful, longer, normal interactions with her. The professionals acknowledged that there is a bond between the Child and Mother. Significantly, the Child's therapist opined that "it makes sense that" severing the relationship between Mother and Child would cause damage to the Child based on how he has spoken about his feelings for Mother. While Ms. Kaufman provided evidence regarding her observations of minimal interaction between Mother and Z.M.W., the trial court was tasked with determining the credibility of that testimony and weighing it accordingly.

Because we will not disturb the court's credibility determinations, and its findings are supported by competent evidence of record, we conclude that the court did not err in determining that adoption is "not best suited to the safety, protection and physical, mental and moral welfare of the child." 42 Pa.C.S. § 6351(f.1)(3). Accordingly, it did not abuse its discretion in maintaining the permanency goal of SPLC.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/17/2018